**A F F I D A V I T**



**STATE OF WEST VIRGINIA**

**COUNTY OF KANAWHA, to-wit:**

I, John A. Reese, being first duly sworn, do hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant to search a residence located at 5205 Elaine Drive, Charleston, West Virginia, 25306, hereinafter the "SUBJECT PREMISES" used by TREYDAN BURKS. As set forth herein, probable cause exists that BURKS has committed and continues to commit violations of 21 U.S.C. § 841(a)(1) – possession with intent to distribute controlled substances to include methamphetamine and heroin. Further, probable cause exists that evidence, proceeds, and fruits and instrumentalities of those offenses are currently located within the SUBJECT PREMISES more particularly described in ATTACHMENT A.

2. I am a Special Agent employed by the United States Department of Justice, the Federal Bureau of Investigation (hereinafter "FBI"), and as such I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C) and am authorized to apply for federal search warrants. I have been employed as a Special Agent of the FBI since August 2014. I am currently assigned to the FBI Charleston Resident Agency, Charleston, West Virginia. I have received specialized training

while attending the FBI Training Academy in Quantico, Virginia, concerning violations of the Controlled Substances Act within Title 21 of the United States Code. During my employment with FBI, I have been working daily as a Special Agent and have been involved in several long-term investigations, including drug trafficking, public corruption, bank robbery, and criminal use of computers and the internet. As part of my duties with the FBI, I investigate violations of federal law, including drug trafficking offenses enumerated in Title 21 U.S.C. §§ 841, 843, and 846, and I have been the affiant on search warrants, pen register trap and trace order applications (PRTTs), personally participated in over 100 arrests and search warrants, and have been an affiant on numerous federal Title III wiretap affidavits. Prior to working for the FBI, I was employed as a police officer with the City of Jackson, Tennessee for five years. During my time as a police officer, I had experience in dealing with drug violations, and various violent crimes.

3. During my tenure with the FBI, I have participated in numerous drug investigations during the course of which I have (a) conducted physical and wire surveillance; (b) executed search warrants at locations where drugs, drug proceeds, and records of drugs have been found; (c) reviewed and analyzed numerous taped conversations and records of drug traffickers; (d) debriefed cooperating drug traffickers; (e) monitored wiretapped

2

conversations of drug traffickers and reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in drug trafficking. Through my training, education, and experience, I have become familiar with (a) the manner and methods by which illegal drugs are imported and distributed; (b) the method of payment for such drugs; and (c) the efforts of persons involved in such activity to avoid detection by law enforcement.

4. I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516. Among other duties, I am participating in an investigation relating to the distribution of controlled substances by TREYDAN LEON BURKS (BURKS), BRIAN DANGELO TERRY (TERRY), JASON OXLEY (OXLEY), JAMES LAWSON (LAWSON), RAMON ALSTON (ALSTON); other persons known; and others as yet unknown ("SUBJECTS" or "SUBJECT INDIVIDUALS"), in violation of 21 U.S.C. §§ 841(a)(1), 843(b), and 846, that is, distribution of controlled substances; use of a communication facility to facilitate drug trafficking; and conspiracy to distribute controlled substances.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.

3

Summaries of recorded conversations are based on draft transcripts of those conversations. This affidavit is intended to show that there is probable cause for the requested warrant and does not set forth all my knowledge about this investigation.

6. Beginning on May 4, 2021, the Honorable Irene C. Berger, United States District Court Judge in the Southern District of West Virginia, entered orders authorizing the interception of wire and/or electronic communications over telephones used by OXLEY, TERRY, BURKS, ALSTON, and FULKERSON (TARGET TELEPHONES #1 through #11). Intercepted communications occurring over the TARGET TELEPHONES have confirmed that the SUBJECTS are heavily involved in distributing large quantities of methamphetamine and heroin in and around Kanawha County, West Virginia and within the Southern District of West Virginia. Currently, the FBI is monitoring TARGET TELEPHONE #8, a telephone used by BURKS, TARGET TELEPHONES #9 and #11, telephones used by FULKERSON, and TARGET TELEPHONE #10, a telephone used by TERRY. Interceptions are scheduled to expire on August 27, 2021.

**Probable Cause**

7. On June 6, 2021, at approximately 4:09 PM (session 902), OXLEY, on TARGET TELEPHONE #2, contacted BURKS, on TARGET TELEPHONE #3. The following was discussed:

Burks: Hello.

Oxley: Where you at?

4

Burks: At da crib.

Oxley: Are we getting together?

Burks: Huh?

Oxley: Are we getting together?

Burks: Nigga I called you all night last night, Hell Yea.

Oxley: Alright look hear listen I'm coming to your house right now.

Burks: What for?

Oxley: I got got got got got got shot last night man I need [unintelligible (U/I)] listen I just need to talk to you alright.

Burks: Bruh pull up I've been calling you all morning [U/I] I've been blowing your ass up.

Oxley: Alright alright.

Burks: Come on brotha.

Oxley: Alright.

8. Based on my training, experience, and the facts of the investigation, OXLEY is asking BURKS if they will meet so OXLEY can purchase fentanyl, ("Are we getting together?"). BURKS said he tried to contact OXLEY the day before, but OXLEY didn't answer, ("Nigga I called you all night last night, Hell Yea"). OXLEY said he was on the way to the SUBJECT PREMISES, ("Alright look hear listen I'm coming to your house right now"). BURKS asked why OXLEY was coming to the SUBJECT PREMISES, ("What for?"). OXLEY said he

5

wanted to discuss something and that he had been shot the previous day, ("I got got got got got got shot last night man I need [U/I] listen I just need to talk to you alright"). BURKS told OXLEY to come over since he had been trying to contact OXLEY all day, ("Bruh pull up I've been calling you all morning [U/I] I've been blowing your ass up").

9. On June 6, 2021, at approximately 4:54 PM, OXLEY was observed on pole camera arriving at the SUBJECT PREMISES in a dark red Chevrolet sport utility vehicle (SUV). At approximately 10:50 PM, a white SUV arrived at the SUBJECT PREMISES, and two men, one of whom appears to be OXLEY, place something into the rear of the SUV. At approximately 11:36 PM, OXLEY was dropped off at his residence in Saint Albans, West Virginia by someone driving a white Jeep Grand Cherokee that appeared to be the same SUV observed earlier at the SUBJECT PREMISES. OXLEY retrieved a bag out of the back of the vehicle and took it into his residence.

10. On June 7, 2021, OXLEY was found unconscious of suspected overdose in his vehicle in Dunbar, West Virginia. Police arrested OXLEY after searching the vehicle and seizing approximately 83 grams of what at first appeared to be fentanyl[1] from inside the vehicle.

---

[1] Laboratory analysis has determined that the substance seized from OXLEY was a new synthetic opioid that has not yet been listed on the schedule of controlled substances. It's effects on the human body are believed to be similar to heroin or fentanyl. The dealers

6

11. On June 6, 2021, at approximately 8:26 PM, (session 912), JAMES BENNETT contacted BURKS on TARGET TELEPHONE #3. The following was discussed:

BENNETT: Hey bruh is it open?

BURKS: Is what open?

BENNETT: Is this uh, is the fuckin car open?

BURKS: Yeah niggah.

BENNETT: Alright.

BURKS: Hey, but you gotta hide the dope too.

BENNETT: Alright.

BURKS: Don't put that in the car. It should be just one zip in there in the thing.

BENNETT: Oh, okay okay.

BURKS: The other shit is in my dresser though. On the back of the back where my drawers is.

BENNETT: Alright.

BURKS: Alright.

12. Based on my training, experiences, and the facts of the investigation, BURKS was concerned that since he had sold OXLEY drugs the day before, he was concerned about police coming to the SUBJECT PREMISES to investigate OXLEY's overdose and possession of suspected fentanyl. In this call, he directed BENNETT to conceal

---

and users appear to believe that the substance is heroin or fentanyl.

7

controlled substances which were located in the SUBJECT PREMISES, ("Hey, but you gotta hide the dope too"). BURKS said there was an ounce of drugs in the house and that BENNETT should not put it in the car, ("Don't put that in the car. It should be just one zip in there in the thing"). BENNETT said he understood, ("Oh, okay okay"). BURKS then described where he had hidden the drugs in the house, ("The other shit is in my dresser though. On the back of the back where my drawers is").

13. On June 6, 2021, following OXLEY's arrest, his wife, BRITTANY BROWNING (BROWNING) made a phone call to BRIAN TERRY at approximately 10:22 PM (session 1903), on TARGET TELEPHONE #4. The following was discussed:

TERRY: I knew it, I knew it. Well, I can tell you one thing, I'm pretty sure I know he got caught with.

BROWNING: What?

TERRY: Some slow.

BROWNING: I already know, huh?

TERRY: Some heroin.

BROWNING: Yea, you know he [U/I] because I fucking found that, that what I wanted to talk to you about, Black. I found that shit this morning, and I should have never fucking gave it back to him.

TERRY: Yep. Cause he told, my my brother told him, he told my brother he had uh, somebody that wanted to

8

buy an ounce, so (coughs) bring the money back today, and I guess he got caught with it.

BROWNING: (U/I) the only reason I gave it back to him cause this morning he was freaking out trying to find it, and he's like but he's like, he's like that's not mine, that's not my money, duh duh duh, that's not mine, that's not mine. So, I felt some type of way, so I gave it back to him, and, usually, but usually if I find anything like that, I flush it.

TERRY: Yep, that, it really was, cause my brother just told me just a minute ago, cause I'm like bro, I don't think he got caught with nothing, he's like man I gave him a zip. I hope he ain't get caught with it.

BROWNING: Like, and that's what I was gonna talk to you about, whoever the fuck that is man, you know how I feel about that shit.

TERRY: I be like I said I didn't know, I just found out about it.

BROWNING: And I think, and I think that's what I think that's why, I think that's what he was fucked up on today.

TERRY: It probably was, cause I had, but I had told my brother, I'm like bro, I had told him, the one time me and you had talked I told him like bro, you know

9

like Jason I think Jason getting high, like, you know what I'm saying, we can't give him none of that shit. And he's like alright, and I said I didn't know they had been talking, you know what I'm saying so . . .

BROWNING: Are you talking about Diddy?

TERRY: Yeah.

14. Based on my training, experience, and the facts of the investigation, TERRY told BROWNING he knew OXLEY was in possession of controlled substances, ("I knew it, I knew it. Well, I can tell you one thing, I'm pretty sure I know he got caught with"). BROWNING said she has suspected this was the case, ("I already know, huh?"). TERRY confirmed that it was a narcotic ("Some heroin"). TERRY then stated that BURKS sold OXLEY the substance the day before, ("Yep, that, it really was, cause my brother just told me just a minute ago, cause I'm like bro, I don't think he got caught with nothing, he's like man I gave him a zip, I hope he ain't get caught with it"). BROWNING then said she does not like heroin being around or OXLEY having it and doesn't know who provided it to OXLEY, ("Like, and that's what I was gonna talk to you about, whoever the fuck that is man, you know how I feel about that shit"). BROWNING later asked if BURKS was the one who had sold the substance to OXLEY and referred to him by his alias, ("Are

you talking about Diddy?"). BURKS confirmed that was BURKS, ("Yeah").

15. On June 30, 2021 at approximately 7:45 PM (session 373), an unidentified subject (hereinafter UM) contacted BURKS on TARGET TELEPHONE #5. The following was discussed:

U/M: Nothin' what you doin' bro?

BURKS: What you lookin' like?

U/M: Nah shit I got bro I'm pretty much ready to come down there. Did they shoot that other two to you?

BURKS: No.

U/M: Alright, well I'll still shoot it to you if not I'll grab it off of him. But yeah, I got mmm I'm probably I'm like 100 short right now.

BURKS: Need to come on so I can give you what I got.

U/M: Alright alright, well let me hit up see what's up. See if I can come today or tomorrow.

BURKS: Ok bet.

U/M: I'm gonna call right now and then let you know.

BURKS: Alright.

16. Based on my training, experience, and the facts of the investigation, BURKS asked UM whether he had enough money to be resupplied, ("What you lookin like?"). UM then said he almost had the money together and asked if another unidentified person had sent BURKS money, ("Nah shit I got bro I'm pretty much ready to

11

come down there. Did they shoot that other two to you?"). BURKS said he had not received it, ("No"). UM said he would make sure BURKS got the money he was owed, and that UM only needed $100 to be ready to buy from BURKS, ("Alright well I'll still shoot it to you if not I'll grab it off of him. But yeah I got mmm I'm probably I'm like 100 short right now"). BURKS then directed UM to come to him to pick up the drugs, ("Need to come on so I can give you what I got").

17. On August 9, 2021, at 3:48 PM (Session 1498), BURKS on TARGET TELEPHONE #8, received an incoming call from DANNIE TERRELL, on telephone (304) 932-8146. The following was discussed:

BURKS: So, she is still outside hitting the horn. I'm in this house with guns and a whole bunch of money.

TERRELL: The bitch, the bitch just told me she was gonna leave you alone. I just told her to leave the damn house.

BURKS: What the fuck? Like nah I'm like give Tia the fuck back. She's still out her right now though.

TERRELL: Alright alright bye.

BURKS: What mother fucking talkin about dad you wanna kill (UI - talking over each other)

TERRELL: Alright alright bye bye (yelling)

18. Based on my training, experience, and the investigation thus far, I believe BURKS and ALEXIS DAVIS (DAVIS) had been engaged

12

in an argument related to custody of their minor child. Just prior to the call described above, DAVIS was observed on pole camera arriving outside the SUBJECT PREMISES. Background noise over calls intercepted over BURKS' telephone (TARGET TELEPHONE #8) confirmed that there was a horn blaring during the call. In the call, BURKS told TERRELL that DAVIS was outside beeping her horn and that there were firearms and money in the house ("So she is still outside hitting the horn. I'm in this house with guns and a whole bunch of money"). He was presumably concerned that someone would call the police because of the disturbance at the residence.

19. On August 9, 2021, at 5:43 PM (Session 1533), BURKS, on TARGET TELEPHONE #8, contacted an unknown female (UF). The following was stated during the conversation:

BURKS: Like I'm not chasin her. She pull up to the trailer. My Landlord out there. She talkin about a niggah you feel me. I got big grams in the house. Big grams and guns. They come in there any time, and I'm goin federal niggah. For what's in that motherfuckin house.

20. Based on my training, experience, and the facts of the investigation. BURKS told UF that he was concerned that police would find the controlled substances and firearms in the SUBJECT PREMISES which would result in him being charged in federal court.

13

21. Based upon the facts of this investigation and the proceeding information, probable cause exists that TREYDAN BURKS currently stores controlled substances, firearms, currency and other evidence of drug trafficking and firearms offenses more fully described in ATTACHMENT B at the SUBJECT PREMISES.

## BACKGROUND: ITEMS TO BE SEIZED

22. Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all facts and opinions set forth in this affidavit, I know that:

   a) Individuals involved in narcotics trafficking often maintain the following items in their residences: controlled substances and paraphernalia for packaging, weighing, cutting, testing, distributing, and manufacturing controlled substances.

   b) Individuals involved in narcotics trafficking often maintain records of their narcotics transactions and other records of evidentiary value for months or years at a time. It is common, for example, for narcotics traffickers to keep pay/owe sheets or other papers of narcotics sold and monies owed. Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts. Such records are often maintained for a substantial period of time, even after

the debts are collected. I have found in my training and experience that such records are invaluable to narcotics traffickers and that such records are rarely discarded. Finally, it has also been my experience that such records and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers, and co-conspirators.

c) Individuals involved in narcotics trafficking must often rely on others to obtain their drugs and to help them market the narcotics. Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residences.

d) Individuals involved in narcotics trafficking commonly earn income in the form of cash and try to legitimize these profits. In order to do this, traffickers frequently attempt to secrete, transfer and conceal the money by means, including: placing assets in the names of other individuals so that they may avoid detection while maintaining control; laundering the money through what appears to be legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace. Records of these and other types of

15

transactions are often found at residences of individuals involved in narcotics trafficking.

e) Individuals involved in narcotics trafficking often keep and maintain large amounts of United States currency at their residences. Such funds are often used for everyday expenditures and to maintain and finance their ongoing narcotics business. Additionally, individuals involved in narcotics trafficking often amass and maintain assets at their residence which were generated by their trafficking activities or purchased with the cash earned from such trafficking.

f) Individuals involved in narcotics trafficking often maintain weapons, firearms, and ammunition on their person or in their residence and/or vehicles. Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs and firearms. Furthermore, I am aware of instances in which traffickers have maintained such items in their residences and vehicles in order to protect themselves and guard their drugs, firearms and profits, as well as for enforcement purposes during their narcotics and firearms dealings.

g) Residences and premises used by individuals involved in narcotics trafficking usually contain articles of

    personal property evidencing the identity of person(s) occupying, possessing, residing in, owing, frequenting, or controlling the residence and premises.

h) Individuals involved in narcotics trafficking frequently communicate with co-conspirators by means of cellular telephones and electronic paging devices and usually maintain these items on their person and/or in their residences and vehicles.

i) Individuals involved in narcotics trafficking often utilize radio scanners, police radios and other electronic equipment in order to conduct counter-surveillance upon law enforcement authorities, and usually maintain these items on their person and/or in their residences and vehicles.

j) Individuals involved in narcotics trafficking often maintain photographs, and/or audio and video recordings of their associates or real and personal property which were acquired with narcotics proceeds or property utilized to facilitate narcotics trafficking activities. Such items are typically maintained in their residences. Drug traffickers often store information relating to their drug trafficking business on computers and/or computer disks.

23. Documents/Records: It is also my opinion and belief that the above-described documents are currently possessed by narcotics dealers and manufacturers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents are kept by narcotics dealers whether or not the dealer is in possession of any drugs and chemicals at any given moment. I believe that the seizure of such documents will provide evidence of the events set forth in this affidavit and that such documents can be found at the target location despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

24. Cellular Telephones: In this case, there is probable cause that BURKS utilizes cellular telephones to facilitate his drug trafficking activities. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular telephones today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. Cellular service providers allow for their subscribers to access

their device over the internet and remotely destroy all of that data contained on the device. For that reason, the device may only be powered in a secure environment of, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. Conversions can be hidden in various applications. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer. Consequently, this warrant seeks authorization to seize and secure cellular telephones found at the SUBJECT PREMISES and to search or analyze the same off-site by one or more trained examiners.

25. The investigation into the criminal activities of the above individuals reveals that their drug distribution activities are ongoing. Due to the quantities of narcotics being distributed

19

and relatively sophisticated manner in which the above individuals conduct their illegal activities, I believe they have been engaged in the illegal sale of narcotics for a long period of time. Based on my training and experience, I believe that the criminal activity described above is, by nature, self-perpetuating. Several of the participants involved in the drug distribution have been targets of law enforcement for several years. They have been arrested on drug distribution investigations in the past, but these arrests have not deterred them from continuing in the business of drug trafficking and distribution. I believe that the items described in Attachment B will provide evidence of the events set forth in this affidavit and that such articles can be found at the SUBJECT PREMESIS despite any lapse of time between the events described and the anticipated search pursuant to this warrant.

Further your Affiant sayeth naught.

Respectfully submitted,

John A. Reese, Special Agent
Federal Bureau of Investigation

Sworn to me by telephone or other reliable or other reliable electronic means on August 11, 2021.

DWANE L. TINSLEY
United States Magistrate Judge